```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
D'JUAN COLLINS,                                      :

                                                     :    12 Civ. 1420 (JPO) (GWG)
                    Petitioner,
                                                     :    REPORT AND
        -v.-                                              RECOMMENDATION
                                                     :

WILLIAM J. CONNOLLY,                                 :

                    Respondent.                      :
---------------------------------------------------------------X
```

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

D'Juan Collins, currently an inmate at the Fishkill Correctional Facility in Beacon, New York, has brought this pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. After a jury trial, he was convicted of Criminal Possession of a Controlled Substance in the Third Degree and Criminal Possession of a Controlled Substance in the Fifth Degree. He was sentenced to a determinate term of eight years in state prison. For the following reasons, Collins's petition should be denied.

I.      BACKGROUND

On October 21, 2007, at approximately 5:40 p.m., Collins was arrested for selling crack cocaine to an undercover police officer. See Transcript of Hearing Held Before the Honorable Rena Uviller, dated May 20, 2008 (annexed as part of Ex. 2 to Declaration in Opposition to Petition for a Writ of Habeas Corpus, filed June 8, 2012 (Docket # 15) ("Gill Decl.")) ("Tr."), 2:21–3:21. Collins was indicted for Criminal Sale of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.39(1); Criminal Possession of a Controlled Substance in the Third Degree with the intent to sell, N.Y. Penal Law § 220.16(1); and Criminal Possession of a Controlled Substance in the Fifth Degree, N.Y. Penal Law § 220.06(5). See Memorandum of

Law in Opposition to Petition for a Writ of Habeas Corpus, filed June 8, 2012 (Docket # 13) ("Gov't Mem."), at 2–3; Declaration in Support of Petition & Motion in Opposition to A.A.G's Memorandum of [sic] Pursuant to Rule 11 et seq., filed Feb. 21, 2013 (Docket # 28) ("Reply Decl."), at iii–iv.

    A.    <u>Suppression Hearing</u>

On May 20, 2008, Collins appeared at a suppression hearing before Justice Rena Uviller. (See Tr. at 1:11–12). Hershel Katz, Esq., initially appeared on Collins's behalf. (Tr. 2:7–8). Justice Uviller informed Collins that if he was convicted he would face a minimum sentence of six years in prison and a maximum of 25 years to life in prison. (Tr. 5:4–19).

The Assistant District Attorney ("ADA") stated that he had extended a plea offer under which Collins would serve four and a half years in prison. (Tr. 5:22–6:2). The judge permitted Collins to confer with his attorney about whether to accept the plea offer. (See Tr. 6:5–15). The judge then stated, "I want to know whether there is a plea or not. We are ready to try the case. I see from the file that this is the third attorney and we are ready to go. Do you wish to plead[?] [T]ell your lawyer." (Tr. 6:17–21). After Collins conferred with his attorney again (Tr. 6:22–23), the Judge stated that "[t]his case has been pending a long time. I gather that this is your third attorney. The case is trial ready and we are going now." (Tr. 7:1–4). Then the following colloquy occurred:

> THE DEFENDANT: Your Honor, in all fairness, please, I have not had a chance to discuss my case with my attorney on May 1st. We were suppose[d] to sit down and talk about my case and about a defense.
>
> THE COURT: Mr. Katz, have you discussed the case with him?
>
> MR. KATZ: Judge, on that date, I tried to see him. The pens were filled at the time. I was informed later on when he became available, I would speak with him.

> He raised issues again that he had with his previous counsel . . . . He . . . said that he didn't threaten his previous attorneys, and I spoke with them. It may not be true, but in any event, I tried to discuss what his defense will be. . . .
>
> THE COURT: I'm not interested in the history. This is his third attorney. Have you all of the <u>Rosario</u>?
>
> MR. KATZ: Yes, and I reviewed it. I had it for at least close to a month now. I reviewed it thoroughly. . . .
>
> THE COURT: Call the witness. We are ready to go. This is the third lawyer. We are going forward now. Once the officer comes in, the offer is gone. . . .
>
> THE DEFENDANT: Your Honor, he hasn't talked to me about a possible defense. I can't go to trial with this attorney.

(Tr. 7:8–8:18). The judge then asked for the history of Collins's representation in the case. (Tr. 8:19–21). The ADA explained that Candace Kurtz of the Legal Aid Society was first assigned to represent Collins in October 2007. (Tr. 8:22–9:4). Kurtz informed a calendar judge that Collins was threatening her and she had a colleague, Thomas Klein, appear on her behalf at a hearing. (Tr. 9:5–15). Kurtz was relieved and "Sema Ayer," an 18B assigned counsel, replaced her. (Tr. 9:16–21). During a hearing in March 2008, Collins physically threatened Ayer in open court. (Tr. 9:22–10:6). As a result, Ayer was also relieved and Katz was assigned to represent Collins. (Tr. 10:7–13). Given Collins's history of representation, the judge decided that "[t]here will be no change of attorneys." (Tr. 10:14–15). She then permitted Collins to discuss his case with Katz during an hour and 20 minute recess. (Tr. 10:16–19).

When the case was recalled after the recess, Collins rejected the plea offer. (Tr. 12:3–5). Then Collins stated: "I suggested to my attorney I wanted to proceed pro se." (Tr. 12:11–12). Justice Uviller questioned Collins, who explained that he had been to trial before, but had never represented himself. (Tr. 12:13–20). Collins stated that he had a G.E.D. and "some para-legal

3

experience." (Tr. 12:23–25). The judge informed Collins that he faced a possible life sentence if he was convicted (Tr. 14:2–4); that he would be given no "extra advantage or benefit" as a result of his pro se status (Tr. 13:5–10); and that he would "be required to follow all the evidentiary rules" (Tr. 13:13–14). The judge also noted that Katz would remain available to Collins for consultations and would represent Collins in the event that Collins used his pro se status to disrupt the proceedings. (Tr. 14:15–22). The judge and Collins then engaged in the following colloquy:

> THE COURT: Knowing that you have a twenty-five [years] [to] life possible sentence, is [representing yourself] what you wish to do?
>
> THE DEFENDANT: At this time I feel I can do no worse than the attorneys I had.
>
> THE COURT: Are you waiving your right to a lawyer?
>
> THE DEFENDANT: I am.

(Tr. 14:24–15:6). After another recess, the judge had Collins sign a waiver of counsel form. (Tr. 17:10–14). The Court then stated: "By the colloquy we had earlier, I'm satisfied that Mr. Collins understands that he has a right to an attorney. He is waiving his right to an attorney; is that correct[,] Mr. Collins?" (Tr. 17:15–19). Collins responded: "Yes, . . . Your Honor." (Tr. 17:20).

The suppression hearing proceeded with Collins representing himself. (See Tr. 17:21–22). The People called Detective John Paul Slater of the New York Police Department, Narcotics Borough Manhattan North. (Slater: Tr. 18:14–16). Slater testified that he was the arresting officer in a "buy and bust operation" on October 21, 2007. (Slater: Tr. 21:1–6). Undercover Officer 7422, the "primary" undercover, was assigned to buy drugs (Slater: Tr.

4

21:7–14), and Undercover Officer 29755, the "ghost" or "secondary undercover," was assigned to protect the primary undercover and give descriptions of suspects (Slater: Tr. 22:21–23:7). Slater had worked with both undercover officers in the past (Slater: Tr. 22:15–16, 24:16–20), and recognized the secondary undercover's voice over the radio (Slater: Tr. 24:21–23).

Shortly before 5:35 p.m. (Slater: Tr. 21:24–25), Slater was in a car parked at the corner of 97th Street and Broadway in Manhattan (Slater: Tr. 26:20–24). He received a radio communication from the secondary undercover stating that the primary undercover "had engaged in a conversation" in front of 2612 Broadway "with a male[,] black, approximately thirty-five to forty years old, approximately five-foot-ten, approximately 160 pounds wearing a black bandana." (Slater: Tr. 23:10–14). The secondary undercover further described the individual as wearing a white T-shirt, gray sweat pants, white sneakers, and glasses. (Slater: Tr. 24:4–15). Approximately two minutes later, Slater received transmissions from both undercover officers that there had been a "positive buy" (Slater: Tr. 26:2–11), meaning that the person who had been speaking to the primary undercover just sold drugs to him (Slater: Tr. 33:9–13).

Slater drove his car to the front of 2612 Broadway (Slater: Tr. 26:15–16) and approached Collins, who was in front of the building and fit the physical description he received from the secondary undercover (Slater: Tr. 27:16–22). While there were other people in the immediate vicinity (Slater: Tr. 32:11–23), Collins was the only person who was dressed in a manner fitting the description (Slater: Tr. 40:23–41:4). Slater, who had his police shield around his neck, said: "Police, show me your hands." (Slater: Tr. 28:1–5). He then handcuffed Collins. (Slater: Tr. 28:6). Approximately five minutes later, the primary undercover indicated over the radio that Collins was the person who sold him drugs. (Slater: Tr. 28:7–29:7). Slater then searched Collins on the street. (Slater: Tr. 29:8–13). He recovered $31 from Collins's front right pocket,

5

which included a $20 bill that was pre-recorded "buy money," and two cell phones. (Slater: Tr. 29:18–23).

When Slater conducted a pat-down search, he noticed an object in the groin area that felt like plastic. (Slater: Tr. 30:1–6). However, he did not recover the object because he "didn't want to go through [Collins's] underwear in public." (Slater: Tr. 30:10–11). It was department policy "to do a pat down search of the prisoner . . . in a dignified manner, [and] not remove articles of clothing or . . . to strip him down on a city street in public view." (Tullo: Tr. 54:10–14). Collins was handcuffed in the rear, which prevented him from reaching into his pants. (Slater: Tr. 42:14–16). The primary undercover also informed Slater that Collins had removed drugs from his crotch area. (Slater: Tr. 43:1–3). He was placed in a transport van with Patrol Officer John Frank Tullo. (See Tullo: Tr. 47:13–22).

After conducting more undercover operations (Slater: Tr. 41:19–23), Collins was brought to the 24th Precinct station house at approximately 7:15 p.m. (Slater: Tr. 41:5–11; Tullo: Tr. 50:11–14). Tullo testified that he was instructed by his supervisor, Sergeant Henry, to conduct a strip search. (Tullo: Tr. 58:8–15). Slater explained that strip searching Collins was necessary because he detected a plastic object near Collins groin during the pat-down search and the primary undercover observed Collins removing drugs from his underwear. (Slater: Tr. 42:24–43:3). Tullo strip searched Collins in the bathroom of the 24th Precinct station house. (Slater: Tr. 39:3–4; Tullo: Tr. 49:5–7). Although he did not remember exactly how he conducted Collins's strip search, Tullo testified that the normal procedure was to start by removing any belts and shoelaces from the arrestee. (Tullo: Tr. 54:22–55:1). Then he would start from the top and work his "way from the shirt to the pants, to the shoes and socks." (Tullo: Tr. 55:1–3). When Collins was completely naked (Tullo: Tr. 55:17–21), Tullo recovered from Collins's groin

area a plastic bag that held 13 smaller plastic bags containing crack cocaine (Tullo: Tr. 50:21–23, 55:20–21; 56:9-10). Tullo performed a visual check of Collins's anus by instructing him to squat and cough. (Tullo: Tr. 56:3–14). When he was satisfied that there was nothing else left to recover, Tullo instructed Collins to get dressed. (Tullo: Tr. 55:3–5). Tullo handed Slater the bag of drugs and informed him where he found it. (Tullo: Tr. 50:24–51:1). Slater field tested the crack cocaine and "vouchered" the rest of Collins's property. (Slater: Tr. 30:18–21).

Collins called no witnesses on his behalf during the suppression hearing. (See Tr. 58:21–23). He argued, however, that the officers did not have probable cause to arrest him because there was no confirmation that the substance exchanged with the primary undercover was crack cocaine until a field test was conducted at 7:15 p.m. on October 21, 2007. (Tr. 59:7–19). In addition, he argued that the bag of drugs found on his person was fruit of unlawful police misconduct, during which he referred to the case of Wong Sun v. United States, 371 U.S. 471 (1963). (Tr. 59:20–60:23). Finally, he argued that the police violated his Fourth Amendment rights because "a search warrant is required" for a search that "violate[s] bodily intrusion" absent an emergency. (Tr. 60:24–61:5).

Justice Uviller found Slater and Tullo to be credible, (Tr. 63:20–25), and made detailed findings of fact consistent with their testimony (see Tr. 64:1–66:13). Justice Uviller concluded as follows:

> Based on the foregoing, the search was based upon probable cause. The officer, the arresting officer was entitled to rely on the communication of two experienced undercover narcotics officers, that a purchase had been made. The defendant fit the description and was in the precise location at 2612 Broadway that had been communicated to him. His arrest was based upon probable cause. Certainly the detention until the primary undercover confirmed his identity, was appropriate, and upon the confirmation made by the primary undercover, the search was made and the cellphones and the money were recovered pursuant to that arrest, and the search at the precinct later was appropriate under the circumstances.

7

Accordingly, the motion to suppress is denied and an exception is noted.
(Tr. 66:14–67:7).

  B. <u>Trial and Sentence</u>

Justice Lewis Bart Stone presided over Collins's jury trial, which took place in May and June 2008. <u>See</u> Transcript of Voir Dire Held Before the Honorable Lewis Bart Stone, dated May 28, 2008 (annexed as part of Ex. 2 to Gill Decl.); Transcript of Trial Held Before the Honorable Lewis Bart Stone, dated May 29, 2008–June 3, 2008 (annexed as Ex. 3–5 to Gill Decl.) ("Trial Tr."). Collins was convicted of Criminal Possession of a Controlled Substance in the Third Degree and Criminal Possession of a Controlled Substance in the Fifth Degree. (Trial Tr. 379:3–15). The jury was unable to reach a verdict on the charge of Criminal Sale of a Controlled Substance in the Third Degree. (Trial Tr. 378:22–379:2). Collins's mother retained Patrick Megaro, Esq., to represent Collins during sentencing and appeal. <u>See</u> Transcript of Sentencing Held Before the Honorable Lewis Bart Stone, dated Aug. 15, 2008 (annexed as part of Ex. 5 to Gill Decl.) ("Sent. Tr."), 10:24–25, 14:17–18. On August 15, 2008, Justice Stone sentenced Collins, as a predicate violent felon (<u>see</u> Sent. Tr. 5:9–10), to a determinate prison term of eight years, to be followed by three years post-release supervision, for the Third Degree possession count (Sent. Tr. 13:16–20). For the Fifth Degree possession count, Collins was sentenced to a determinate prison term of two and a half years and two years post-release supervision to run concurrently with the other sentence. (Sent. Tr. 13:23–14:1).

  C. <u>Direct Appeal</u>

Collins filed a direct appeal of his conviction with the Appellate Division, First Department. <u>See</u> <u>People v. Collins</u>, 77 A.D.3d 404 (1st Dep't 2010), <u>lv. denied</u>, 16 N.Y.3d 797

8

(2011). Collins's attorney filed a brief on Collins's behalf, which argued, inter alia, that the hearing court failed to conduct the proper inquiry before allowing Collins to represent himself. See Brief for Defendant-Appellant, dated May 4, 2009 (annexed as Ex. A to Gill Decl.), at 30–34. With permission from the court, Collins also submitted a pro se supplemental brief, claiming that: (1) Katz provided ineffective assistance of counsel by consulting with him for only one hour and 20 minutes prior to the suppression hearing, see Supplemental Appellate Brief for Defendant-Appellant, dated Aug. 7, 2009 (annexed as Ex. B to Gill Decl.), at 8–15; and (2) the hearing court denied him a full and fair hearing in which to litigate his Fourth Amendment claims, id. at 16–37.

On October 5, 2010, the Appellate Division affirmed the conviction. Collins, 77 A.D.3d at 405–06. In a pro se letter, Collins sought leave to appeal to the New York State Court of Appeals. See Letter from D'Juan Collins to the Honorable Jonathan Lippman, undated (annexed as Ex. E to Gill Decl.). Collins argued, inter alia, that he received ineffective assistance of counsel because Katz conferred with him for only an hour and 20 minutes before the suppression hearing, and that his Due Process rights were violated as a result of "cumulative and/or fundamental errors" during the suppression hearing. Id. at 2. On February 24, 2011, Collins's application for leave was denied. See People v. Collins, 16 N.Y.3d 797 (2011).

D.   The Instant Petition and Motion

Collins timely filed the instant petition for a writ of habeas corpus on February 23, 2012. See Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, filed Feb. 23, 2012 (Docket # 2) ("Pet."). Collins seeks relief on three grounds: (1) that he was denied a full and fair hearing in which to litigate his Fourth Amendment claim; (2) that he was denied effective assistance of counsel because counsel failed to consult with him prior to the

9

suppression hearing, except for the time period allotted by the hearing court; and (3) that the hearing court failed to make impartial and adequate findings of fact and conclusions of law with respect to the strip search. Id. ¶ 13. The respondent filed opposition papers on June 8, 2012. See Gov't Mem.; Gill Decl. On February 21, 2013, Collins filed reply papers. See Memorandum of Law in Support of Petition for Habeas Corpus/Opposition in Response to A.A.G.'s Memorandum of Law Pursuant to Rule 11, filed Feb. 21, 2013 (Docket # 28) ("Reply Mem."); Reply Decl.

In a separate motion, Collins demands that the respondent be judicially estopped and sanctioned pursuant to Fed. R. Civ. P. 11 for taking inconsistent positions in the direct appeal and in opposition to this petition. See Notice of Motion Pursuant to Rule 11 et seq. of the F.Rules [sic] Civ. Proc., filed Feb. 21, 2013 (Docket # 26) ("Rule 11 Notice"); Affirmation in Support of Motion, dated Jan. 15, 2013 (annexed to Rule 11 Notice); Memorandum of Law Pursuant to Rule 11 et seq., of the F.R.C.P., filed Feb. 21, 2013 (Docket # 27) ("Rule 11 Mem."). The respondent has not filed papers addressing this motion.

II.     LEGAL STANDARD GOVERNING REVIEW OF HABEAS CORPUS PETITIONS BROUGHT PURSUANT TO 28 U.S.C. § 2254

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For a claim to be "adjudicated on the merits" within the meaning of section 2254(d), it

must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and cites no relevant federal case law. Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Harrington v. Richter, 131 S. Ct. 770, 784–85 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") (citation omitted); see also id. at 784 (section 2254(d) deference applies even "[w]here a state court's decision is unaccompanied by an explanation"). Moreover, a state court's "determination of a factual issue" is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. Williams v. Taylor, 529 U.S. 362, 405 (2000). Habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 407, 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been

11

objectively unreasonable — a standard that is met only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. Harrington, 131 S. Ct. at 786; accord id. ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."). In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786–87.

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question." Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir.), cert. denied, 588 U.S. 1063 (2009). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) (citation omitted); accord Brisco, 565 F.3d at 90 (court applying a "fact-dependent standard . . . . to the facts of a specific case is . . . entitled to significant 'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting Yarborough, 541 U.S. at 664).

Only holdings of the Supreme Court are considered for purposes of determining "[c]learly established federal law." Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir. 2008) (citation and internal quotation marks omitted); accord Marshall v. Rodgers, 133 S. Ct. 1446, 1450–51 (2013) (a legal principle does not qualify as "clearly established" even if it is "widely accepted among the Federal Circuits that [the legal principle] would, if presented to [the Supreme] Court, be accepted as correct") (citations omitted). Thus, "[n]o principle of

constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Rodriguez, 537 F.3d at 106–07 (citation omitted).  Where there is "[n]o holding" from the Supreme Court on the question presented, Carey v. Musladin, 549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer to the question presented" in the petition, Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam), a state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.  See Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citations and internal quotation marks omitted).

III.    DISCUSSION

    A.    Ineffective Assistance of Counsel

Collins argues that he received ineffective assistance of counsel because Katz neglected to consult with him except for the one hour and 20 minutes prior to his suppression hearing.  Pet. ¶ 13.  "In order to prove ineffective assistance, [a petitioner] must show (1) 'that counsel's representation fell below an objective standard of reasonableness'; and (2) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (quoting Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)); accord United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010); see also Massaro v. United States, 538 U.S. 500, 505 (2003) ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").  In evaluating the first prong — whether counsel's performance fell below an objective standard of reasonableness — "'[j]udicial

scrutiny . . . must be highly deferential,'" and the petitioner must overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Bell v. Cone, 535 U.S. 685, 698 (2002) (alteration in original) (quoting Strickland, 466 U.S. at 689) (internal quotation marks omitted); see Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according counsel a presumption of competence).

To satisfy the prejudice requirement, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; accord Lynn v. Bliden, 443 F.3d 238, 247–48 (2d Cir. 2006), cert. denied, 549 U.S. 1257 (2007). With respect to the second prong, the Second Circuit generally "requires some objective evidence other than defendant's assertions to establish prejudice." Pham, 317 F.3d at 182 (citing United States v. Gordon, 156 F.3d 376, 380–81 (2d Cir. 1998) (per curiam)).

Here, Collins has not demonstrated that his counsel's failure to consult with him for more than an hour and 20 minutes prior to the suppression hearing fell below an objective standard of reasonableness. "Because Strickland admonishes against mechanical standards for ineffectiveness, there is no set rule for the number of times counsel must meet with a defendant." Rosario v. Bennett, 2002 WL 31852827, at *29 (S.D.N.Y. Dec. 20, 2002) (citing cases); accord Farr v. Greiner, 2007 WL 1094160, at *31 (E.D.N.Y. Apr. 10, 2007) ("There is no required minimum number of meetings between counsel and client.") (citations omitted). Additionally, courts have consistently held "that the brevity of consultation time between a defendant and his counsel alone cannot support a claim of ineffective assistance of counsel." Raposo v. United States, 2004 WL 1043075, at *3 (S.D.N.Y. May 7, 2004) (citations and internal quotation marks

omitted); accord Bolden v. Poole, 2010 WL 5072129, at *5–6 (W.D.N.Y. Nov. 22, 2010) (counsel's performance not deficient where consulted with client only once while he was in custody and for only several minutes before a Wade hearing); Rosario, 2002 WL 31852827, at *29 (petitioner cannot show ineffective assistance based on "a bare allegation that his counsel did not consult with him long enough"). There is simply nothing else in the record that would support a conclusion that Katz did not act reasonably in his consultation with Collins. For example, the record provides no information as to the nature of Collins's discussions with counsel or why the discussions were insufficient. Because Collins "does not point to any specific act his attorney should have performed to prepare the defense better," Billy-Eko v. United States, 8 F.3d 111, 118 (2d Cir. 1993), the State courts did not unreasonably apply Strickland in concluding that Katz's performance did not fall below an objective standard of reasonableness.

   Collins has also failed to show prejudice. That is, he has not demonstrated how additional or different communications with Katz would have altered the outcome of the suppression hearing. See, e.g., Bolden, 2010 WL 5072129, at *5 (no prejudice where petitioner "failed to demonstrate how trial counsel's failure to visit negatively affected counsel's ability to defend"); Farr, 2007 WL 1094160, at *32 (finding no prejudice where it was "unlikely that more communication with counsel would have changed the outcome of the trial" given the "overwhelming evidence of petitioner's guilt"); Raposo, 2004 WL 1043075, at *3 (no prejudice where petitioner failed to explain how his "position at trial would have been improved with additional opportunities for consultation with his attorney"). The evidence from the police officers at the hearing showed there was no basis whatsoever to grant Collins's suppression motion. There is no reason to believe that additional or different consultations with Katz would

have led to a different ruling from Justice Uviller.

Accordingly, the claim of ineffective assistance of counsel must be rejected.

B.     Fourth Amendment Claims

Collins argues that (1) he was denied a full and fair hearing in which to litigate his Fourth Amendment claims and (2) that the hearing court failed to make impartial and adequate findings of fact and conclusions of law with respect to the strip search. Pet. ¶ 13 (Points I and III).

The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 481–82 (1976); accord Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992). As the Second Circuit has explained, habeas review of Fourth Amendment claims will be "undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan, 975 F.2d at 70 (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977)).

New York provides a corrective procedure in the form of a suppression hearing. See N.Y. Crim. Proc. Law § 710.10 et seq.; Capellan, 975 F.2d at 70 n.1 ("'[F]ederal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate.'") (quoting Holmes v. Scully, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)); see also Reply Mem. at 1 (petitioner concedes that the State provided a corrective mechanism in this case). Thus, the only issue is whether there was "an unconscionable breakdown" in the hearing process.

16

An unconscionable breakdown occurs where the process is rendered "meaningless [because] the totality of the state procedures allegedly did not provide rational conditions for inquiry into federal law . . . questions." Capellan, 975 F.2d at 70 (alterations in original) (citations and internal quotation marks omitted); see also Calderon v. Perez, 2011 WL 293709, at *32 (S.D.N.Y. Jan. 28, 2011) ("[A]n unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society.") (citation and internal quotation marks omitted), adopted, 2011 WL 1405029 (S.D.N.Y. Apr. 5, 2011). The "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72.

Here, the court conducted an evidentiary hearing to determine if Collins's arrest and subsequent search violated the Fourth Amendment. Collins was given an opportunity to cross-examine the prosecution's witnesses (Tr. 32:1–45:3; 52:1–55:5) and to call witnesses of his own (Tr. 58:21–23). Following the testimony, the hearing court issued findings of fact and conclusions of law in support of its decision. (Tr. 63:20–67:7). Thus, the hearing fully aired the defendant's suppression claim and was fairly conducted.

Collins argues that there was an unconscionable breakdown because the hearing court neglected to make specific rulings on whether the strip/cavity search was incident to arrest and whether the police had a warrant to conduct the strip/cavity search. Reply Mem. at 14–18. But the hearing court found that the search at the precinct was "appropriate under the circumstances." (Tr. 67:4–5). Thus, Collins's complaint is simply that the court failed to specifically discuss certain grounds for relief under the Fourth Amendment. Collins's argument fails because it amounts simply to an attack on the level of detail provided in the court's decision

17

on the suppression motion. A decision lacking in detail cannot constitute an "unconscionable breakdown" under Stone v. Powell, however. See, e.g., Allah v. LeFevre, 623 F. Supp. 987, 991–92 (S.D.N.Y. 1985) (describing bribery of a judge, use of torture, and use of perjured testimony as examples of what might constitute an "unconscionable breakdown"); cf. Grajales v. Brown, 2008 WL 2313137, at *6 (E.D.N.Y. June 2, 2008) (police destruction of 911 tapes that may have been used in suppression hearing not "unconscionable breakdown"). To the extent Collins is arguing that the trial court reached the wrong result, that argument is similarly barred by Stone v. Powell. See generally Capellan, 975 F.2d at 71 (habeas relief not available where the petitioner's argument is that a "federal court may have reached a different result"). Because Collins's attack on his suppression hearing is not a permissible ground for habeas relief, it must be rejected.

        C.        Judicial Estoppel and Rule 11 Sanctions

In a separate motion, Collins demands that the respondent be judicially estopped and sanctioned pursuant to Fed. R. Civ. P. 11 for taking inconsistent positions here and in the state courts. See Rule 11 Mem. at 1. He further demands sanctions because the respondent misrepresented facts by "co-joining and intertwining point III and point I" of his petition. Id. at 12. Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Zedner v. United States, 547 U.S. 489, 504 (2006) (citations and internal quotation marks omitted). Rule 11 bars filings that are based, inter alia, on contentions that are unwarranted by existing law or a nonfrivolous argument for changing existing law. See Fed. R. Civ. P. 11(b)(2).

    Collins did not comply with the procedural requirements of Rule 11 and thus that portion

of his motion would be denied for this reason alone.[1] But even if Collins had complied with the procedural requirements, his motion would still be denied.

The reasoning of Collins's motion is almost impossible to follow. It appears to be premised on the fact that the cases cited and arguments made by respondent in this Court are different in some instances from the cases cited and arguments made by the District Attorney on the direct appeal. We will put aside the question of whether the judicial estoppel doctrine applies given that there were two different parties opposing Collins in the proceedings — on appeal, the People of the State of New York, and here, Collins's current custodian. Collins's argument fails most obviously because he has not identified a specific argument that was "accept[ed]" by the Appellate Division that if accepted by this Court would create the perception that one of the courts had been "misled." New Hampshire v. Maine, 532 U.S. 742, 750 (2001) (internal quotation marks omitted). To put it simply: there is no statement in the Appellate Division's opinion that is inconsistent with any proposition that is being accepted by this Court. Accordingly, Collins's motion for Rule 11 sanctions and judicial estoppel must be denied.

IV.     CONCLUSION

For the foregoing reasons, Collins's petition for habeas corpus (Docket # 2) and his motion for sanctions and judicial estoppel (Docket # 26) should be denied.

---

[1] Specifically, Collins did not comply with the "safe harbor" provision of Fed. R. Civ. P. 11(c)(2), which requires that the party moving for sanctions serve the non-moving party with motion papers 21 days before filing with the Court. See Hadges v. Yonkers Racing Corp., 48 F.3d 1320, 1328 (2d Cir. 1995) (district court abused its discretion in imposing sanctions where attorney was not served with motion 21 days prior to filing with the court). Collins states that he served the respondent with the Rule 11 motion on February 15 and 16, 2013, Reply Decl. at vii, and the motion was filed less than a week later on February 21, 2013.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. J. Paul Oetken, at 40 Centre Street, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Oetken. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: May 17, 2013
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies to:

D'Juan Collins
08-A-4646
Fishkill Correctional Facility
P.O. Box 1245
Beacon, NY 12508

Counsel by ECF